**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BUDO TRADING LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>    v.<br><br>J.P. MORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES LLC, J.P. MORGAN FUTURES, INC. (now known as J.P. MORGAN SECURITIES LLC), and JOHN DOES 1-50,<br><br>       Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Budo Trading LLC, individually and on behalf of all others similarly situated, files this Complaint against Defendants J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., and J.P. Morgan Securities LLC, J.P. Morgan Futures, Inc. (now known as J.P. Morgan Securities LLC) (collectively, "J.P. Morgan"), and John Does 1-50 (collectively, with J.P. Morgan, "Defendants"), for violations of the Commodity Exchange Act. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.     This case is brought under the Commody Exchange Act ("CEA"), 7 U.S.C. §1, *et seq*., for losses suffered when Plaintiff and the Class purchased and/or sold U.S. Treasury futures contracts and options on those contracts ("Treasury Futures") on domestic exchanges at artificial prices that were the result of spoofing and market manipulation by J.P. Morgan.

2.     The central theory of this case is straightforward. Beginning in 2009, unbeknownst to Plaintiff and the Class, J.P. Morgan used an illegal trading strategy called "spoofing" – entering orders to buy or sell Treasury Futures though it never intended to execute those orders – to fool everyone else and create an artificial appearance of market demand and artificial prices.

3.     Spoofing, which Congress criminalized in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, is the illegal trading strategy where a trader creates artificial supply and demand by placing large and small orders on opposite sides of the market. Spoofing seeks to increase the available profits associated with high frequency trading by artificially altering the price of a given future via entering buy or sell orders that the trader has no intention of fulfilling.  This action induces other traders to react in response, creating a small window in the market that the trader can use to reap an excessive profit.

4.      The Commodity Futures Trading Commission ("CFTC"), which has long regulated and sought to punish similar conduct under other provisions of the CEA, defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution," including "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards."[1]

5.      J.P. Morgan confirmed on February 25, 2020, in its annual report Form 10-K with the Securities Exchange Commission ("SEC"), that it was subject to criminal and regulatory investigations regarding illegal manipulation. J.P. Morgan admitted that "[v]arious authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct.  The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries."[2]

6.      The *Wall Street Journal* has also reported such conduct, writing "[a]ccording to people familiar with the matter, the investigation also is probing the bank's trading in futures."[3] The investigation involves prosecutors within the Department of Justice ("DOJ") Criminal Division's fraud section and includes offices from the CFTC.[4]

---

[1]      CFTC, Interpretive Guidance and Policy Statement on Disruptive Practices, https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last accessed July 23, 2020).

[2]      JPMorgan Chase & Co. 2019 Form 10-K, at 280-81 (Feb. 25, 2020), https://jpmorganchaseco.gcs-web.com/node/315401/html (last accessed July 23, 2020).

[3]      Dave Michaels, *Government Is Broadening Investigations of Spoofing-Like Practices*, WALL STREET JOURNAL (Mar. 17, 2020), https://www.wsj.com/articles/government-is-broadening-investigations-of-spoofing-like-practices-11584446400 (last accessed July 23, 2020).

[4]      Global Investigations Review, *DOJ Expands JPMorgan Spoofing Probe* (Mar. 17, 2020), https://globalinvestigationsreview.com/short-cut/2020/march/17 (last accessed July 23, 2020).

7.      This is not the first time J.P. Morgan has used spoofing to manipulate futures prices. The regulatory investigation into Defendants' trading practices in the Treasury Futures market comes on the heels of other ongoing regulatory investigations including spoofing the precious metals futures markets.  Beginning in 2018, DOJ criminally charged several of Defendants' employees, including Michael Nowak, head of the precious metals trading desk, for their roles in manipulating the prices of precious metals futures contracts.  Two employees, John Edmonds and Christian Trunz, have since pled guilty and are cooperating with the ongoing federal criminal investigation.[5]  Similarly, CFTC has imposed civil penalties and sanctions against several of those same individuals.

8.      Although it has been publicly disclosed that Defendants' Treasury Futures trading practices are subject to criminal investigation, most details of their conduct remain hidden from view.  Defendants' illegal practices occurred on futures markets, where participants' activities are shielded by anonymity in order to protect proprietary trading strategies.  Defendants also were aware that their conduct was illegal and, if exposed, would subject them to serious criminal and civil penalties.  Accordingly, Defendants' misconduct was concealed.  Discovery is likely to yield additional facts to support Plaintiff's allegations.

9.      Defendants' conduct caused actual damages to Plaintiff and members of the Class in violation of the Commodity Exchange Act, 7 U.S.C. §1, *et seq*.  Plaintiff seeks damages caused by Defendants' illegal spoofing and Defendants' violations of the Commodity Exchange Act.

---

[5]      *See U.S. v. Edmonds*, No. 3:18-cr-00239-RNC-1 (D. Conn. 2019); Order Instituting Proceedings Against John Edmonds Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 19-26, July 25, 2019; *U.S. v. Trunz*, No. 1:19-cr-00375 (E.D.N.Y. 2019); Order Instituting Proceedings Against Christian Trunz Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 19-26, September 16, 2019.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction under 28 U.S.C. §1331 because this action arises under the Commodity Exchange Act, 7 U.S.C. §1.

11.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. §25(c).  During the Class Period, each Defendant resided, transacted business, was found, or had agents in the District; a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, as more particularly alleged below. Defendants are headquartered in this District.

12.    This Court has personal jurisdiction over each Defendant, because each Defendant was found or resided in this District, had agents in this District, or transacted business throughout the United States, including this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.    THE PARTIES

13.    Plaintiff Budo Trading LLC was at all relevant times a Delaware limited liability company.  Budo Trading LLC is a trading firm that transacted in Treasury Futures during the Class Period, including purchases and sales of futures on domestic exchanges.  These instruments were manipulated by Defendants' conduct, and Plaintiff Budo Trading LLC had transactions that were adversely impacted by this manipulation.  As a direct and proximate result of the wrongdoing alleged herein, Plaintiff Budo Trading LLC was harmed as described below and suffered economic injury as a result.

14.     Defendant J.P. Morgan Chase & Co. is a Delaware corporation headquartered at 270 Park Avenue, New York, New York 10005.  J.P. Morgan Chase & Co. is a multinational banking and financial services corporation.

15.     Defendant J.P. Morgan Clearing Corp. is a Delaware corporation headquartered at 4 Chase Metrotech Center, Brooklyn, New York 11245.  J.P. Morgan Clearing Corp. offers securities and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker-dealers, and investment advisors.  It also provides operational and administrative services for registered broker-dealers.

16.     Defendant J.P. Morgan Securities LLC is a Delaware company and its principal place of business is located at 277 Park Avenue, New York, New York 10172.  J.P. Morgan Securities LLC operates as a subsidiary of Defendant J.P. Morgan Chase & Co.  During the Class Period, J.P. Morgan Securities LLC, including its predecessors, served as a primary dealer of U.S. Treasury securities and transacted in U.S. Treasury-based instruments, including Treasury Futures.

17.     Defendant J.P. Morgan Futures, Inc. (now known as and merged into J.P. Morgan Securities LLC) was a Delaware corporation headquartered in New York, New York until June 1, 2011, when it was acquired by Defendant J.P. Morgan Securities LLC.  Collectively, the individual J.P. Morgan Defendants are referred to herein as "J.P. Morgan."

18.     Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Treasury Futures.  The defined term "Defendants" also includes John Doe Defendants.

19.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Treasury Futures, at artificial prices not reflecting

fundamental supply and demand, to Defendants' direct benefit.  The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

20.    All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint.  These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

21.    Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## IV.    FACTUAL ALLEGATIONS

### A.    Overview of Treasury Futures

22.    The U.S. government sells securities known as Treasuries (bonds, notes, and bills) to investors at public auctions.  Treasuries are loans to the U.S. government backed by the full faith and credit of the United States.  Holders of Treasury securities are thus creditors of the U.S.

23.    An investor trading U.S. Treasury Futures contracts can buy or sell a future or option contract on a domestic exchange like the Chicago Mercantile Exchange ("CME").  Futures contracts involve a promise – generally made through a futures exchange – to buy or sell a particular commodity or financial instrument, at a predetermined price, on a fixed date in the future (*i.e.*, on an "expiry date").  Futures contracts can also be cash-settled, instead of requiring physical delivery of the underlying commodity or instrument on the expiry date.

24.     An option contract is an agreement that gives the buyer the right – but not the obligation – either to buy (in the case of a "call option") or to sell (in the case of a "put option") a particular commodity or financial instrument, at a predetermined price, at or during a specified time period in the future (the "expiry date").  The agreed price is generally known as the "strike price."

25.     The main driver of whether an option is exercised is whether it is "in the money" or "out of the money."  An in-the-money option is one where the holder is entitled to a cash payment if she exercises the option.  For example, if an option holder has the right to buy a widget at a price of $100 (a call), and the market price for the widget is currently $400, the call option is in the money – because the option holder could make a $300 profit by buying a widget for $100 and immediately selling it for $400.

26.     An out-of-the-money put or call is one where the option holder is not entitled to a cash payment if she exercises the option.  For example, if an option holder has the right to sell a widget at a price of $100 (a put), and the market price for the widget is currently $400, the option is out of the money – because the opportunity to sell at $100 is worthless when the option holder could sell at $400 on the open market.

27.     Treasury bonds and notes are specifically sold at fixed terms (two-year, three-year, five-year, seven-year, 10-year, 20-year, and 30-year) and at fixed interest rates determined by the prevailing market rates at the time of sale.  Treasury bonds have maturities of 20 or 30 years.  Treasury notes have maturities of between two and 10 years.  Treasury bonds and notes pay interest every six months (known as the "coupon").  The interest rates (or "yields") on U.S. Treasuries are used in the pricing of many financial instruments.

28.     The holder of a Treasury bond or note can either hold the security until maturity, at which time the face value (or "par") becomes due and is repaid by the government, or the holder can sell the security in the secondary market prior to maturity.  The secondary market for U.S. Treasuries is the world's most liquid government securities market.  Treasuries are traded around the clock, leading to constant price fluctuations.  In the secondary market, a seller recovers the current market value of the Treasury, which can be more or less than its face value, depending upon prevailing interest rates at the time of the sale.

29.     Treasury Futures and options on Treasury Futures – which are the subject of this complaint – were first introduced on the Chicago Board of Trade in 1977.  They are standardized contracts for the purchase and sale of Treasury notes or bonds for future delivery.  Treasury Futures provide investors the right to buy or sell Treasuries at a future date, without the need to hold the underlying Treasury in the interim.  Treasury Futures and option contracts are available for each of the Treasury benchmark tenors:  two-year, five-year, 10-year, and 30-year.  In addition, the CME offers Ultra 10-year T-Note Futures and Ultra U.S. Treasury Bond Futures.

30.     Investors in Treasury Futures or options can either buy (*i.e.*, take a "long" position) or sell (*i.e.*, take a "short" position).  A long position means that the investor believes that prices will rise; they expect to be able to sell (*i.e.*, settle or close their position) at a higher price in the future.  A short position means that the investor believes that prices will decline; they expect to be able to buy (*i.e.*, settle or close their position) at a lower price in the future.

31.     Each U.S. Treasury Futures contract has a face value at maturing of $100,000 with the exceptions of two-year and three-year U.S. Treasury Futures contracts which have face value at maturity of $200,000.  Prices are quoted in points per $2,000 for the two-year and three-year contract and points per $1,000 for all other U.S. Treasury Futures.

32.     Treasury Futures are standardized, highly liquid, and transparent instruments. From 2009 to 2019, the average daily volume of U.S. Treasury futures traded more than doubled from an average of approximately 1.5 million contracts daily to approximately 4.5 million contracts daily.[6]  During the same period, the average daily volume of U.S. Treasury options traded increased from 200,000 to more than one million contracts daily.[7]

**B.     "Spoofing" to Manipulate Prices**

33.     Treasury Futures and options are very actively traded in a highly liquid market and trades are executed on electronic platforms.  In addition, trading on these platforms is anonymous, and the identity of any trader behind a specific bid or ask is unknown to market participants.  These characteristics make the market for Treasury Futures and options particularly susceptible to manipulation by an illegal practice known as "spoofing."

34.     Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act amended the CEA's "Prohibited Transactions" section.[8]  This statute, 7 U.S.C. §6c(a)(5)(C), reads in pertinent part, that "it shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."[9]

35.     In the wake of Dodd-Frank, CME adopted rules that specifically prohibit spoofing as a supplement to their pre-existing prohibitions on manipulative trading practices.  The CME

---

[6]     *See*  https://www.cmegroup.com/education/files/interest-rates-chartbook-2019.pdf   (last accessed July 23, 2020).

[7]     *Id*.

[8]     *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, §747, 124 Stat. 1376, 1739 (2010).

[9]     7 U.S.C. §6c(a)(5)(C) (2012).

Group Exchanges' Rule 575 (which took effect in September of 2014) prohibits "Disruptive Practices" and provides in part: "All orders must be entered for the purpose of executing bona fide transactions. . . .  No person shall enter or cause to be entered an order with the intent, at the time of order entry, to cancel the order before execution or to modify the order to avoid execution."[10]

36.     Spoofing is used by traders to manipulate prices and it undermines the integrity of trading.  The CFTC defines spoofing to include:  (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity; (b) submitting or cancelling bids or offers to delay another person's execution of trades; (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth; or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[11]

37.     Former CFTC director of enforcement Aitan Goelman has stated that "protecting the integrity and stability of the U.S. futures market is critical to ensuring a properly functioning financial system."[12]

38.     An example of how spoofing works is as follows:[13]

---

[10]     *See also* CME Rules 432.B.2., 432.H., 432.Q., 432.T. (general prohibitions on dishonest and manipulative conduct and conduct inconsistent with just and equitable principles of trade), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/4/4.pdf (last accessed July 23, 2020).

[11]     CFTC Interpretive Guidance and Policy Statement on Disruptive Practices, https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last accessed July 23, 2020).

[12]     CFTC Press Release (May 5, 2015). *CFTC Charges United Arab Emirates Residents Heet Khara and Nasim Salim with Spoofing in the Gold and Silver Futures Market* [Press Release 7171-15], https://www.cftc.gov/PressRoom/PressReleases/7171-15 (last accessed July 23, 2020).

[13]     U.S. Congressional Research Service. High Frequency Trading: Overview of Recent Developments (R44443; Apr. 4, 2016), by Rena S. Miller and Gary Shorter, https://fas.org/sgp/crs/misc/R44443.pdf (last accessed July 23, 2020).



39.     Spoofing is generally understood to be a trading strategy in which a large order is placed on one side of the market and a small order is placed on the opposite side.  There is no intention to trade the larger order.  The intention is that the smaller order is traded and the larger order will be canceled.

40.     By flooding the market with trade orders that are never intended to be filled, a spoofer can create fake demand that pushes prices up or down, which tricks other investors into buying or selling at artificial or manipulated prices.  The spoofer can then scoop up the mispriced contracts and reap a profit by flipping them at the true market price.

41.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market participants, hindering competition, undermining market integrity, and harming law-abiding victims.  And, as alleged here, Defendants' use of spoofing harmed Plaintiff and the Class members who purchased or sold Treasury Futures at artificial prices during the Class Period.

42.     Below is an example of classic spoofing behavior that occurred on March 18, 2019 in the June 2019 U.S. Treasury Long Bond Contracts market.  It illustrates in real time how spoofing induces a buyer to pay the manipulated price caused by the spoofing entity.

43.     On the observation date, 143 ($14.3 million) June 2019 Treasury Long Bond Contracts were purchased for a price of 146.1875, which was the offered side of the inside market at the time of purchase.  The bid side of the market at the time was 146.15625.

44.     The buyer paid the offer side because at the time stamp 15:36:46.149 (CST), the current market bid and offer prices were:

| Bid | Offer | Bid Size | Offer Size |
|-----|-------|----------|------------|
| 146.15625 | 146.1875 | 319 | 1000 |

45.     But within 67 milliseconds (7% of one second) of this purchase, 74 order book updates (routed orders or changes to the order book) occurred *without any trades or cancelations occurring*.  In that extremely short period of time, it is impossible that more than one participant could have made those 74 changes.

46.     As a result of the order book updates the amount on the bid and offer, rose to:

| Bid | Offer | Bid Size | Offer Size |
|-----|-------|----------|------------|
| 146.15625 | 146.1875 | 1433 | 684 |

47.     The spoofing party made it appear that there were more investors looking to buy at 146.15625 (the bid price) than investors looking to sell at 146.1875 (the offer price).  This abrupt imbalance between bid and offered amounts lured investors wanting to buy the contracts to buy them at the offered price (146.1875) rather than wait to have them sold to them at the bid price (146.15625).

48.     Then, at 15:36:46.216 (CST), based upon this new data, 13 trades on 143 contracts occurred within a half second thus raising the offer price of 146.1875 on those 143 contracts.  At

the exact same time, the remaining 541 (of the 684) contracts offered ***disappear completely from the order book***.

49.     Next, at 15:36:46.728 (CST), the new best bid shown in the order book has been inflated to 146.1875 and then, mere seconds later, at 15:36:49.514 (CST), the bid moves back down to the original market seen at the outset of this example, 146.15625 (bid) and 146.1875 (offer).

50.     Therefore, due to the spoofing conduct, buyers on the bid were lured to meet the higher offer for 143 contracts.  By buying the 143 contracts at 146.1875 as opposed to the earlier market price of 146.15625, the buyer overpaid $4,468.75.

51.     The above illustrative example is just one of many that can be observed throughout the Class Period using available data.

**C.     J.P. Morgan's Spoofing Strategy**

52.     Unbeknownst to Plaintiff and the Class, Treasury Futures have been hijacked by J.P. Morgan so it could manipulate demand and pricing.  And this hijacking was occurring, consistently, for ***years***.  Thus, far from reflecting market volatility, J.P. Morgan fooled everyone else into accepting artificial prices.

53.     Defendants used spoofing to manipulate the U.S. Treasury markets by submitting, and then quickly withdrawing, orders they never intended to fill once it has served its purpose (here, creating the false appearance of demand to either buy or sell certain Treasury instruments).  Specifically, J.P. Morgan placed orders it never intended to execute ("Deceptive Orders"), thus creating an artificial appearance of market demand and artificial prices that in turn induced other market participants to act.

54.     The DOJ, in a release related to a similar J.P. Morgan spoofing investigation, recently said "[t]his false and misleading information was intended to, and at times did, trick other

market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling previous metal futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[14]

55.    Once the market moved in the direction of J.P. Morgan's Deceptive Orders, its traders then cancelled the Deceptive Orders.  At the same time, J.P. Morgan placed orders in the opposite direction of its Deceptive Orders for the same Treasury instrument at the same price as the Deceptive Orders ("Aggressor Orders").

56.    Caught in the middle are market participants induced by the spoofing orders to enter sell orders below, or buy orders above, what would otherwise have been the prevailing market price and quantity.

57.    J.P. Morgan then took advantage of the movement that the artificial prices of its Deceptive Orders had caused by cancelling the Deceptive Orders and turning around to purchase or sell those instruments at the now artificially low or high prices and quantities, all to the detriment of those traders who acted based on the (false) belief that the Deceptive Orders were legitimate and intended to be executed.

58.    In addition, other market participants maintained positions below or above what would otherwise have been the prevailing market price and quantity.  Market participants made these trading decisions based on what appeared to be a legitimate change in supply or demand.

---

[14]    DOJ Press Release (Nov. 15, 2019). *Superseding Indictment Charges Former Precious Metals Salesman with Racketeering Conspiracy*, [Press Release], https://www.justice.gov/opa/pr/ superseding-indictment-charges-former-precious-metals-salesman-racketeering-conspiracy   (last accessed July 23, 2020).

**D.     Plaintiff and Members of the Class Were Harmed by J.P. Morgan's Spoofing**

59.     Defendants' spoofing deprived Plaintiff and members of the Class of a lawfully operating market during the Class Period.

60.     Plaintiff and members of the Class were harmed because they were transacting in products that were ***not*** the result of regular forces of supply and demand.  Rather, Plaintiff and members of the Class were tricked into trading Treasury Futures that were mispriced due to Defendants' spoofing conduct and the subsequent inflation or suppression of the price.

61.     As a result, Class members were forced to pay more for (or to accept less from) these products than they would have in a fair and orderly market.  The artificial forces that manipulated the affected products coincided with Plaintiff's investment decisions, causing Plaintiff concrete monetary harm.  As a result, Plaintiff and the Class suffered actual damages and harm.

**E.     J.P. Morgan's Pattern of Illegal Spoofing to Manipulate Futures Prices**

62.     Over the last ten years, J.P. Morgan has repeatedly engaged in trading practices that violated federal law and triggered civil and criminal sanctions.[15]

63.     Ongoing investigations by the DOJ and CFTC have exposed widespread and long-running spoofing practices at J.P. Morgan that already have resulted in admissions of guilt by two

---

[15]     For example, in 2013, J.P. Morgan agreed to pay U.S. federal energy regulators $410 million in connection with "power" market manipulation claims.  It also agreed to pay a criminal fine of $550 million in connection with a Plea Agreement in May 2015 related to market-rigging of the FX spot market.

J.P. Morgan traders.[16]   Additional J.P. Morgan traders have pending criminal indictments.[17] "[M]ore than a dozen people" are alleged to have participated in the J.P. Morgan spoofing scheme.[18]

64.     Beginning in 2018, DOJ criminally charged several of Defendants' employees, including Michael Nowak, head of the precious metals trading desk, for their roles in manipulating the prices of precious metals futures contracts.  Two employees, John Edmonds and Christian Trunz, have since pled guilty and are cooperating with the ongoing federal criminal investigation.[19] Similarly, CFTC has imposed civil penalties and sanctions against several of those same individuals.

65.     Trunz specifically pled guilty to "one count of conspiracy to engage in spoofing and one count of spoofing."  He admitted that between July 2007 and August 2016 he placed

---

[16]     DOJ Press Release (Nov. 6, 2018).  *Former Precious Metals Trader Pleads Guilty to Commodities Fraud and Spoofing Conspiracy* [Press Release], https://www.justice.gov/opa/pr/ former-precious-metals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy     (last accessed July 23, 2020); DOJ Press Release (Aug. 20, 2019).  *Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges* [Press Release], https://www.justice.gov/opa/pr/ precious-metals-trader-pleads-guilty-conspiracy-and-spoofing-charges   (last accessed July 23, 2020).

[17]     *See, e.g.*, Superseding Indictment, *U.S. v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. Nov. 14, 2019), ECF No. 52, ¶26e.

[18]     Tom Schoenberg and David Voreacos, *JPMorgan's Metals Desk Was a Criminal Enterprise, U.S. Says*, BLOOMBERG (Sept. 16, 2019), https://www.bloomberg.com/news/articles/ 2019-09-16/jpmorgan-s-metals-desk-was-a-criminal-enterprise-u-s-says (last accessed July 23, 2020).

[19]     *See U.S. v. Edmonds*, No. 3:18-cr-00239-RNC-1 (D. Conn. 2019); Order Instituting Proceedings Against John Edmonds Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 19-26, July 25, 2019; *U.S. v. Trunz*, No. 1:19-cr-00375 (E.D.N.Y. 2019); Order Instituting Proceedings Against Christian Trunz Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, CFTC Docket No. 19-26, September 16, 2019.

thousands of orders that he did not intend to execute for gold, silver, platinum, and palladium futures contracts traded on CME Group-operated exchanges.[20]

66.     Remarkably, Trunz acknowledged that his conduct was known to and encouraged by his supervisors at J.P. Morgan:  "Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors[.]"[21]

67.     Edmonds, another J.P. Morgan metals trader, pled guilty on November 6, 2018 to participating in a spoofing conspiracy.[22]  In announcing the guilty plea, the DOJ stated:  "Edmonds admitted that he learned this deceptive trading strategy from more senior traders at the Bank, and he personally deployed this strategy hundreds of times with the knowledge and consent of his immediate supervisors."[23]

68.     The investigation and charges also noted that J.P. Morgan employed an advanced method of spoofing – namely, J.P. Morgan traders layered multiple Deceptive Orders at different prices in rapid succession that, in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side genuine order.  This new style of "layering" was more difficult both to execute and to detect.[24]

---

[20]     DOJ Press Release (Aug. 20, 2019). *Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges* [Press Release], https://www.justice.gov/opa/pr/precious-metals-trader-pleads-guilty-conspiracy-and-spoofing-charges (last accessed July 23, 2020).

[21]     *Id.*

[22]     *Id*.

[23]     *Id*.

[24]     Superseding Indictment, *U.S. v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. Nov. 14, 2019), ECF No. 52, ¶26e.

69.     Recently, J.P. Morgan disclosed that these government investigations into spoofing – which initially focused on manipulative trading of precious metals futures – have expanded into Defendants' trading of Treasury instruments, as stated in recent filings with the SEC:

> Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries. Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct.  The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries.[25]

70.     Further, on March 17, 2020, the *Wall Street Journal* also reported that Defendants are being probed for market manipulation of Treasury securities.[26]   As the article noted, "[a]ccording to people familiar with the matter, the investigation also is probing the bank's trading in futures."[27]

71.     The ongoing DOJ and CFTC investigations have revealed that J.P. Morgan cultivated a trading culture and strategy rooted in market manipulation, including the systemic use of spoofing to bolster its profits at the expense of other market participants.

72.     This is also not the first instance where traders spoofed the Treasury Futures and options market.  Between July 2011 and December 2012, five Citigroup Inc. traders manipulated the U.S. Treasury futures market more than 2,500 times according to regulators who imposed a fine of $25 million on the bank.[28]

---

[25]     J.P. Morgan Chase & Co. 2019 Form 10-K, at 280-281, (Feb. 25, 2020), https://jpmorganchaseco.gcs-web.com/node/315401/html (last accessed July 23, 2020).

[26]     Dave Michaels, *Government is Broadening Investigations of Spoofing-Like Practices*, Wall Street Journal (Mar. 17, 2020), https://www.wsj.com/articles/government-is-broadening-investigations-of-spoofing-like-practices-11584446400 (last accessed July 23, 2020).

[27]     *Id.*

[28]     Dave Michaels, *Citigroup to Pay $25 Million to Settle Spoofing Claims*, Wall Street Journal (Jan. 19, 2017), https://www.wsj.com/articles/citigroup-to-pay-25-million-to-settle-spoofing-claims-1484841122 (last accessed July 23, 2020).

73.    It is unlikely that a profitable, albeit illegal, trading strategy that was systematically employed with the knowledge and encouragement of J.P. Morgan supervisors, would not also be used to bolster trading profits across other trading desks.  Indeed, the recent disclosure that J.P. Morgan is being investigated for the spoofing of Treasury securities and futures confirms that such conduct was not confined to the metals traders at J.P. Morgan.

## V.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

74.    Defendants actively, fraudulently, and effectively concealed their unlawful conduct and manipulation of the Treasury Futures market.

75.    Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were manipulating the Treasury Futures market.  Until recently, as a result of Defendants' hidden misconduct, affirmative misstatements and acts of concealment, Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were manipulating the Treasury Futures market.

76.    Plaintiff and the Class did not and could not know of Defendants' unlawful acts before February 25, 2020, at which time Defendants disclosed in their 2019 Form 10-K filing with the SEC that regulators were investigating their trading of Treasury instruments.

77.    Defendants never disclosed that they placed "spoofed" orders to manipulate the prices of Treasury Futures and options on Treasury Futures.  Indeed, the very purpose of Defendants' spoofing was the deception of Plaintiff and the Class; only by tricking counterparties into believing in the artificial demand created by their spoofed orders could Defendants complete their series of trades for a profit – which they did.

78.    Defendants' manipulation is also inherently self-concealing.  Trades on electronic platforms are anonymous.  Defendants engaged in manipulative activities that were carried out at

least in part, through means and methods specifically designed to avoid public detection and which, until very recently, successfully eluded public detection.  Therefore, Plaintiff and the Class could not have discovered Defendants' conduct prior to Defendants' public disclosures.

79.     Defendants also affirmatively conveyed to Plaintiff and the Class that they abided by market rules and laws, including the CEA prohibition on spoofing.  For example, J.P. Morgan published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries."  In the Code of Conduct, J.P. Morgan claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business."

80.     For these reasons, all applicable statute of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VI.    CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons and entities who transacted in Treasury Futures or options on Treasury Futures that were traded on a United States exchange beginning at least as early as January 1, 2009 through the present (the "Class Period").

82.     The following persons and entities are excluded from the above-described proposed Class:

    A.     Defendants, their co-conspirators, and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

    B.     all governmental entities;

    C.     all Counsel of Record; and

D.      the Court, Court personnel, and any member of their immediate families.

83.     Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable.  Plaintiff believes that there are hundreds or thousands of members of the Class widely dispersed throughout the United States.  Moreover, given the costs of complex litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

84.     Plaintiff's claims are typical of the claims of members of the Class.  Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct.

85.     Plaintiff will fairly and adequately protect and represent the interests of the members of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

86.     Plaintiff is represented by counsel with experience in the prosecution of class action litigation with experience in class action litigation involving CEA claims.

87.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

88.     Questions of law and fact common to the Class include:

A.      whether Defendants participated in the Treasury Futures market;

B.      whether Defendants' fixed, lowered, maintained, stabilized, or otherwise manipulated Treasury Futures prices;

C.     the nature and duration of the Defendants' manipulation of the Treasury Futures market;

D.     whether Defendants' conduct violated the CEA;

E.     whether Defendants fraudulently concealed their misconduct from Plaintiff and other members of the Class;

F.     whether the conduct of Defendants, as alleged in this complaint, caused damages to Plaintiff and other members of the Class; and

G.     the appropriate measure of damages sustained by Plaintiff and other members of the Class.

89.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.   Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

90.     Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**VII.   CLAIMS FOR RELIEF**

<u>**FIRST CLAIM FOR RELIEF**</u>

**Violation of 7 U.S.C. §1, *et seq*. and Regulation 180.2
Manipulation in Violation of the Commodity Exchange Act**

91.     Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

92.    During the Class Period Defendants intended to and did cause artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. §1, *et seq.*, through the use of spoofing and other manipulative conduct.

93.    By spoofing the Treasury Futures market, Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity in violation of the CEA.

94.    During the Class Period, Treasury Futures' prices did not result from the legitimate market information and the forces of supply and demand.  Instead, Treasury Futures' prices were artificially manipulated by Defendants' spoofing conduct.

95.    Throughout the Class Period, Defendants entered large orders to buy or sell with no intention of filling them, instead planning to cancel those orders prior to execution.  Defendants polluted the market with false information about supply and demand to manipulate prices up or down.  As a result of this conduct, Plaintiff and the Class were damaged by losses on their Treasury Futures trades.

96.    Defendants' manipulative conduct of Treasury Futures' prices persisted throughout the Class Period and caused damages to Plaintiff and Class members who purchased or sold at the artificial prices.

97.    Defendants had the ability to cause, intended to cause, and did cause, artificial prices of Treasury Futures.  Defendants were active in the markets for Treasury Futures throughout the Class Period and were aware of the effects of spoofing on the markets.

98.    By their intentional misconduct, each Defendant violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

99.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

100.     Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

101.     Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. §1, *et seq*., and Regulation 180.2, and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violation of 7 U.S.C. § 1, *et seq*. and Rule 180.1(a)**
**Employment of Manipulative or Deceptive Device in Violation of the**
**Commodity Exchange Act**

102.     Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

103.     Defendants' spoofing conduct, including the use of submitting and cancelling orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes use of a manipulative and deceptive device.

104.     Defendants acted intentionally, or at least acted recklessly, in employing the manipulative and deceptive device.  The ability of Defendants' spoof orders to mislead other market participants into believing there was genuine demand for purchasing or selling as represented by the Defendants' deceptive orders must have been known to Defendants.

105.     Defendants knew that their spoof orders would impact the trading decisions of other market participants; thus, Defendants were, at a minimum, reckless with respect to the danger that their spoof orders would mislead other market participants.

106.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

107.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on those Futures contracts to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

108.     Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

109.     Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. §1, *et seq*., and Rule 180.1(a), and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

## **THIRD CLAIM FOR RELIEF**

### **Violation of 7 U.S.C. §1, *et seq*.**
### **Vicarious Liability in Violation of the Commodity Exchange Act**

110.     Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

111.     Defendants are liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

112.    Defendants' spoofing deprived the Class of a lawfully operating market during the Class Period.

113.    Plaintiff and the Class transacted at artificial and unlawful prices resulting from the Defendants' manipulations in violation of the CEA, 7 U.S.C. §1, *et seq*., and as a direct result thereof were injured and suffered damages.  Plaintiff and the Class sustained and are entitled to actual damages for the violations of the CEA alleged therein.

## VIII.   RELIEF REQUESTED

114.    Accordingly, Plaintiff, on behalf of itself and the proposed Class, respectfully requests:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.      For a judgment awarding Plaintiff and the Class damages, as well as punitive or exemplary damages, against Defendants for their violations of the CEA, together with pre- and post-judgment interest at the maximum rate allowable by law;

C.      For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

D.      For such other and further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Date:  July 24, 2020                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                        s/ Christopher M. Burke
                                             _____
                                             Christopher M. Burke (CB-3648)
                                             Thomas K. Boardman (TB-0530)

The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile:  212-233-6334
cburke@scott-scott.com
tboardman@scott-scott.com

Douglas A. Millen
Steven A. Kanner
Brian M. Hogan
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
Facsimile:  224-632-4521
dmillen@fklmlaw.com
skanner@fklmlaw.com
bhogan@fklmlaw.com

Jonathan M. Shapiro
AETON LAW PARTNERS LLP
101 Centerpoint Drive, Suite 105
Middletown, CT 06457
Telephone: 860-740-0321
jms@aetonlaw.com

*Counsel for Plaintiff Budo Trading LLC and
the Proposed Class*